[No. 19402. Department Two. February 10, 1926.]

GUS WEBBER *et al.*, *Respondents*, v. PACIFIC POWER & LIGHT COMPANY, *Appellant*.[1]

[1] WATERS AND WATERCOURSES (80)—PUBLIC WATER SUPPLY—POLLUTION—LIABILITY TO CONSUMER—EVIDENCE—SUFFICIENCY. A verdict against a public service company for damages through furnishing impure water, from which plaintiff claims to have contracted typhoid fever, rests upon conjecture and speculation, and is not sustained by evidence of an analysis of a sample of water which was not collected in a sterilized container or so protected as to be of any value as evidence, another proper test disclosed no bacteria, there was no other case of typhoid from using the water in the city, and the attending physician, after investigation, was unable to satisfy himself as to the cause of plaintiff's infection.

Appeal from a judgment of the superior court for Franklin county, Truax, J., entered February 17, 1925, upon the verdict of a jury in favor of plaintiff, in an

[1]Reported in 242 Pac. 1104.

action for damages for supplying impure water. Reversed.

*John A. Laing, Henry S. Gray,* and *M. L. Driscoll,* for appellant.

*Chas. W. Johnson,* for respondents.

PARKER, J.—The plaintiffs, Webber and wife, seek recovery of damages from the defendant company, suffered, as it is claimed, by Mrs. Webber becoming sick with typhoid fever from the use in their home in Pasco of typhoid bacteria-infected water furnished by the defendant, it being engaged in furnishing water for domestic purposes to the inhabitants of Pasco under a franchise therefor granted by that city. A trial upon the merits, in the superior court for Franklin county, resulted in a verdict of a jury and judgment rendered thereon by the court awarding to the plaintiffs recovery in the sum of $1,000, from which the defendant has appealed to this court.

Counsel for appellant company, by timely appropriate motions, challenged the sufficiency of the evidence to support any recovery by respondents, Webber and wife. The overruling of these motions and the refusal of the trial court to decide, as a matter of law, that the evidence does not support any recovery is the principal claim of error here relied upon for the reversal of the judgment, and the only claim of error necessary for us to notice.

Since long prior to the time of Mrs. Webber's becoming sick, appellant has been engaged in the furnishing of water for domestic purposes to the approximately four thousand inhabitants of the city of Pasco, taking the water from the Columbia river and distributing it through mains to the consumers. Respondents' dwelling house in which they live is furnished water

from a connection from one of appellant's mains, at a point approximately four hundred feet, measured along the main, from a dead end of the main. There are four other dwellings furnished with water from the main from connections between respondents' connection and the dead end of the main, where there is a fire hydrant. This fire hydrant is supposed to be opened from time to time to let the still, or dead, water escape, and thus flush the dead end of the main. For present purposes we shall assume that appellant neglected to cause the dead end of the main to be so flushed for a period of a month or more prior to Mrs. Webber's becoming sick, and that such flushing should be done more often than that, probably as often as once every two weeks, in order to keep the water in the dead end reasonably pure.

On about June 10th, Mrs. Webber became sick. She was attended by Dr. Kammann, and, about a week later, he diagnosed her sickness to be typhoid fever. He was then, and for sometime thereafter, the city's health officer. Mrs. Webber was then removed to the hospital, where she remained three weeks and then returned to her home, and later recovered. Dr. Kammann made investigation as to the cause of Mrs. Webber's sickness, and, while arriving at the conclusion that she might have become infected with typhoid bacteria from the use of the water from the appellant's main, it seems plain that he never arrived at any fixed opinion that she did so become infected. After testifying at considerable length touching the possible cause of Mrs. Webber's infection, he finally testified, referring to the possible cause: "I never did satisfy myself."

There were, during the period from January to August, only three other cases of typhoid fever in Pasco; as to when each occurred, we are not advised.

As to these, Dr. Kammann gave it as his opinion that all three cases were the result of causes other than the water furnished by appellant through its mains. None of these cases had any connection whatever with respondents' dwelling, or any of the dwellings receiving water from this main between respondents' dwelling connection and the dead end of the main. Dr. Kammann was a witness in behalf of respondents. On July 12th, Mr. Webber procured an empty bottle from a drug store and filled it with water from the faucet in their house, first letting the water run awhile, corked the bottle and sealed it. There was no showing that this bottle or the cork were sterilized in any manner; nor that Mr. Webber sterilized his hands before handling the cork and bottle while filling it. This, it is to be noticed, occurred about four weeks after Mrs. Webber first became sick and about three weeks after Dr. Kammann had diagnosed her sickness as being typhoid fever. Mr. Webber sent this bottle of water to Mr. Nightingale, assistant bacteriologist at the state college at Pullman, for analysis. The bottle was not packed in ice or in any manner protected, looking to the preservation of its proper temperature in transit so as to have the water remain in the same condition, as to bacteria, during transit. It was five days in transit, during the heat of the summer. Soon after its arrival Mr. Nightingale analyzed the water, and found that typhoid bacteria had developed therein. In his written report to Mr. Webber of his analysis, received in evidence and verified by his testimony, following a statement of the analysis in technical terms, he further stated:

"If the above is a true analysis of your water, it is UNSAFE for drinking and culinary purposes. But as the sample was not collected in a sterilized container provided by us, and as the sample which you sent was

delayed several days in reaching us, we do not guarantee this report. There will not be anyone in this laboratory to repeat the analysis for you within the next month. Therefore, we advise you to write to the state board of health, 216 Douglas Bldg., Seattle, Wash., for a sterile container in which to send them another sample. They will give you a report free of charge. It is possible that this water, if our analysis is correct, is spreading typhoid in your city.''

Thereafter, about July 25th and later, following the suggestion of Mr. Nightingale as above quoted, Mr. Webber obtained proper sanitary containers, and, following directions, sent other samples of water from the faucet in their home to the state board of health at Seattle, where, upon analysis of those samples, they failed to disclose the presence of any typhoid bacteria. As to the sample first sent to Mr. Nightingale at the state college and analyzed by him, he not only refused to guarantee his report, because of want of sanitary putting up of the water in a proper container, but, also, because of delay in transmission, during which time, as the evidence shows, there was ample period for typhoid bacteria to germinate and develop in the bottle, from infection that might have been in the bottle itself or upon the cork, or the hands of the one who put the water in the bottle. Testimony of another highly skilled sanitary engineer, and also of an experienced doctor with the state board of health, with no testimony or evidence to the contrary, is to the effect that the analysis of the first sample by Mr. Nightingale is of no value as evidencing the presence of typhoid bacteria in the water at the time that sample was put into the bottle, or at any time prior thereto. The sanitary engineer was a witness for respondents. The doctor with the state board of health was a witness for appellant. The skill of the latter touching the

germination of typhoid bacteria was particularly vouched for by Dr. Kammann, who was a witness for respondents. As to impurities that might have been in the water in the dead end, even assuming that any such impurities might have had some effect upon the water passing through the connection into respondents' home, 400 feet distant therefrom, within which intervening distance there were four other house connections, all of the expert testimony touching such possible impurities is, without exception, to the effect that the presence of typhoid bacteria in or near the dead end was highly improbable. This view was entertained by all the expert witnesses. A painstaking review of the whole of the evidence convinces us that there is nothing therein more favorable to respondents' right of recovery than is found in this summary made by us.

[1] We feel constrained to hold that to allow this verdict and judgment to stand would be simply to allow it to rest upon pure conjecture and speculation. The possible impurities or stagnant nature of the water in the dead end, manifestly, in the light of the undisputed evidence as to its nature, furnish no support whatever to respondents' right of recovery. The analysis made by Mr. Nightingale of the first bottle of water put up by Mr. Webber, in the light of the undisputed evidence, is of no evidentiary value as to the water used by Mrs. Webber from appellant's mains containing any typhoid bacteria causing her sickness. The analysis of other samples of the water, later sent by Mr. Webber to the state board of health at Seattle, prove nothing as against appellant. This, to our minds, is but a case where one of many causes might have resulted in Mrs. Webber becoming infected with typhoid bacteria. It cannot be said with any degree of certainty, indeed what evidence there is negatives the idea, that Mrs.

Webber became infected with typhoid bacteria from the water used by her from appellant's main.

The judgment is reversed, and the cause remanded to the superior court with directions that it be dismissed with prejudice as against respondents.

TOLMAN, C. J., MAIN, MITCHELL, and MACKINTOSH, JJ., concur.